A08A0354. GLOBAL SHIP SYSTEMS, LLC et al. v.
CONTINENTAL CASUALTY COMPANY et al.
(663 SE2d 826)

RUFFIN, Presiding Judge.

Global Ship Systems, LLC, GSS Operations, LLC, and Southeastern Industrial & Marine Services, Inc. (collectively, "Global") own a shipyard in Savannah. After the shipyard's marine railway experienced failures, Global filed claims under insurance policies issued by Continental Casualty Company ("CNA") and Landmark American Insurance Company and Arch Specialty Insurance Company (collectively, "Landmark/Arch"). The companies denied coverage, and Global brought an action against them. The trial court granted summary judgment to CNA on the issue of coverage under its policy and denied Global's motion for partial summary judgment as to coverage under the Landmark/Arch policy. Global appeals, and, for reasons that follow, we affirm.

"Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law."[1] On appeal from the grant or denial of a motion for summary judgment, we conduct a de novo review of the law and the evidence.[2] We construe the evidence and all inferences drawn from it in a light most favorable to the nonmoving party.[3] The underlying facts are not in dispute here. Global's shipyard uses a marine railway that "transport[s] vessels into and out of the water." The marine railway consists of:

> (a) a set of parallel railway tracks mounted on a concreted bedplate, which are approximately 350 feet in length and on a 16 degree incline that run into the Savannah River; (b) a

---

[1] *Woody's Steaks, LLC v. Pastoria*, 261 Ga. App. 815, 816 (584 SE2d 41) (2003).

[2] See *Simpson v. Infinity Select Ins. Co.*, 269 Ga. App. 679, 681 (605 SE2d 39) (2004).

[3] See id.

cradle (flatbed) that rides on rollers (trucks) on the railway tracks and onto which a vessel is placed for movement[;] (c) a hauling chain, which is kept in tension by a separate chain (the tension chain), that is attached to the cradle and fed around two gear sprockets[; and] (d) a six stage speed reducer (reduction gears) that [is] coupled to an electric motor.

The marine railway experienced mechanical failure in December 2004 and May 2005, and Global sought coverage for its damages under insurance policies issued by CNA and Landmark/Arch. The companies denied coverage. The trial court granted summary judgment to CNA on the issue of coverage under its policy and denied Global's motion for partial summary judgment as to coverage under the Landmark/Arch policy.

1. Global first argues that the trial court erred in holding that the "marine railway is a 'hoist' as that term is used in the insurance policy issued by CNA." Both parties moved for summary judgment on this issue, and the trial court granted summary judgment to CNA. The policy issued by CNA was for "Boiler and Machinery Coverage." In defining the objects covered, the policy specifically excludes any "[c]onveyor, crane, elevator, escalator, or hoist, but not excluding any electrical machine or electrical apparatus mounted on or used with this equipment." CNA contends that the marine railway is a hoist and therefore "coverage is limited to any electrical machine or electrical apparatus mounted on or used with this equipment." Global argues that CNA's interpretation of the term "hoist" is not the only reasonable interpretation, and that the mere fact that the marine railway lifts or "hoists" objects does not make it a hoist.

Insurance policies are contracts and are governed by the same rules of contract construction that apply to other contracts.[4] Contract construction is generally a question of law for the court.[5] We follow a three-step process in construing a contract, first determining if the contract language is clear and unambiguous.[6] When a contract contains no ambiguity, "the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning."[7] If, however, the contract is unclear, we attempt to resolve the ambiguity by applying the rules of contract construction.[8]

---

[4] See *Collier v. State Farm &c. Ins. Co.*, 249 Ga. App. 865, 866 (2) (549 SE2d 810) (2001).

[5] See OCGA § 13-2-1.

[6] See *Mitchell v. Cambridge Property Owners Assn.*, 276 Ga. App. 326, 327 (1) (623 SE2d 511) (2005).

[7] (Punctuation omitted.) Id.

[8] See id.

Where the contract remains ambiguous even after we apply the rules of construction, then the parties' intent must be determined by the factfinder.[9]

"Ambiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct[,] or when a word or phrase may be fairly understood in more than one way."[10] Under Georgia law, "words in a contract generally bear their usual and common meaning . . . [and] [t]he usual and common meaning of a word may be supplied by common dictionaries."[11] However, terms of art or words connected to a particular trade are given the signification attached to them by experts in such art or trade.[12] Here, the trial court considered various dictionary definitions, all leading to its conclusion that "the function of a hoist is 'to lift,' and the verb 'hoist' is defined as 'to raise or haul up.'" It found that this usual and common meaning was also consistent with the testimony of various expert witnesses that the function of the marine railway is to lift vessels out of the water.

Global, however, points to the testimony of one of its experts, the engineer who designed the marine railway, who opined that the word "hoist" is not generally used to describe a marine railway. But we agree with the trial court that all of the expert testimony indicates that the function of the marine railway is to lift vessels into and out of the water. Global's own expert describes the movement of a vessel on the marine railway as "lifting or hoisting the vessel out of the water." Global also cites a case from a Nova Scotia trial court, *Lunenburg Indus. Foundry &c. v. Commercial Union Assurance Co. of Canada*,[13] for the proposition that a boiler and machinery policy excluding hoists and conveyors nonetheless covered a marine railway.[14] This case is not binding authority and, moreover, was decided under Canadian law.[15] Under these circumstances, we agree with the trial court that the marine railway is a hoist within the meaning of the CNA policy, and CNA is thus entitled to summary judgment on the issue.

---

[9] See *Simpson v. Pendergast*, 290 Ga. App. 293, 296 (1) (659 SE2d 716) (2008).

[10] *Sheridan v. Crown Capital Corp.*, 251 Ga. App. 314, 315 (1) (554 SE2d 296) (2001).

[11] (Citation and punctuation omitted.) *Auto-Owners Ins. Co. v. Parks*, 278 Ga. App. 444, 446 (1) (629 SE2d 118) (2006).

[12] See OCGA § 13-2-2 (2) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."); *Southland Dev. Corp. v. Battle*, 272 Ga. App. 211, 214 (612 SE2d 12) (2005).

[13] 2005 NSSC 23 (230 NSR2d 249) (Supreme Court of Nova Scotia, February 11, 2005).

[14] Id. at ¶ 61.

[15] See *Nichols v. Ga. Television Co.*, 250 Ga. App. 789, 791 (1) (552 SE2d 550) (2001) (cases from foreign jurisdictions "are not binding on this [C]ourt.").

2. Global also asserts that the trial court erred in finding "that the marine railway is a dock as that term is used in the Landmark/Arch insurance policies." Landmark/Arch issued two commercial property policies providing coverage for damage to or physical loss of "Covered Property" resulting from a "Covered Cause of Loss." The policies provide that "Covered Property" does not include "[b]ulkheads, pilings, piers, wharves[,] or docks." Landmark/Arch denied coverage for any damage to the marine railway, based in part on its argument that docks are not covered property under the policies. Global argued that the marine railway is not a dock and sought summary judgment on this issue. The trial court determined that the marine railway is a dock and therefore denied Global's motion for summary judgment.

The trial court's analysis again focused on dictionary definitions of the term "dock." We agree with its conclusion that "each of the various definitions supplied by the opposing parties describe[s] a dock as essentially an area of water that is utilized for the reception of ships, which is exactly the function of Global's marine railway." Even if we consider the term "dock" as a term of art in relation to a shipyard, we reach the same conclusion. Materials in the record describing types of docks used in shipyards refer to a system such as Global's marine railway as a "railway dry dock." And there is case law to support the proposition that a marine railway is considered a dry dock.[16] Accordingly, we affirm the trial court's denial of summary judgment to Global on this issue.

*Judgment affirmed. Andrews and Bernes, JJ., concur.*

DECIDED JUNE 25, 2008 — 

*Weiner, Shearouse, Weitz, Greenberg & Shaw, Malcolm Mackenzie III*, for appellants.

*Hunter, Maclean, Exley & Dunn, Robert S. Glenn, Jr., Locke, Lord, Bissell & Liddell, David M. Leonard, Drew, Eckl & Farnham, Paul W. Burke, Brian T. Moore*, for appellees.

---

[16] See, e.g., *Avondale Marine Ways v. Henderson, Deputy Commr.*, 346 U. S. 366, 367 (74 SC 100, 98 LE 77) (1953) (Burton, J., concurring specially) (stating that a marine railway is a type of dry dock); *Maryland Cas. Co. v. Lawson*, 101 F2d 732, 733 (5th Cir. 1939) ("In nautical parlance 'dry dock,' 'floating dock[,]' and 'marine railway' are interchangeable terms.").